UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

This Document Relates To:                            :
                                                     :
SUSAN CUOMO, Individually and as                     :
Administratrix for the Estate of JOSEPH CUOMO,       :
                                                     :          No. 13 Civ. 00273 (SAS)
                          Plaintiff,                 :
                                                     :
              v.                                     :
                                                     :
AIR & LIQUID SYSTEMS CORP., et. al.,                 :
                                                     :
                                                     :
------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REMAND TO STATE COURT FOR LACK OF SUBJECT MATTER JURISDICTION

Kyle A. Shamberg, Esq. [KS-5015]
**WEITZ & LUXENBERG, P.C.**
Attorneys for Plaintiffs
700 Broadway
New York, New York 10003
(212) 558-5500
kshamberg@weitzlux.com

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

CRANE DOES NOT HAVE A COLORABLE
"GOVERNMENT CONTRACTOR" DEFENSE ............................................................. 6

CONCLUSION................................................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988)......................................3, 6, 14

*Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653 (E.D. Tex. 1999).......... 13

*Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187 (D. Mass. 2008)................... 7

*Hill v. Delta Intern. Machinery Corp.*, 386 F. Supp. 2d 427 (S.D.N.Y. 2005)................. 6

*Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129 (D. Mass. 2009) ......................... 14

*In re Joint Eastern & Southern Dist. Asbestos Litig.*,
715 F. Supp. 1167 (E.D & S.D.N.Y. 1988)...................................................................... 6

*Kings Choice Neckwear, Inc. v. DHL Airways, Inc.*,
2003 WL 22283814 (S.D.N.Y. Oct. 2, 2003).................................................................. 6

*Lopez v. Wells*, 2008 WL 2662018 (S.D.N.Y. July 7, 2008) ............................................ 5

*Miranda v. Abex Corp.*, 2008 WL 4778886 (S.D.N.Y. Oct. 31, 2008) ............................ 8

## Statutes

28 U.S.C. § 1442(a)(1) .................................................................................................. 1, 2

28 U.S.C. § 1447(c) .......................................................................................................... 1

## I. **INTRODUCTION**

Plaintiffs, Joseph and Susan Cuomo, submit this memorandum in support of their motion to remand this matter to the Supreme Court of the State of New York, County of New York, pursuant to 28 U.S.C. § 1447(c), for lack of subject matter jurisdiction.[1]

Plaintiffs commenced this action against various defendants, including the removing defendant, Crane Co. (hereinafter "Crane" or the "defendant") on November 28, 2012, under Index No. 190549/2012.  The complaint alleges that Mr. Cuomo was exposed to asbestos-containing products from 1974 through 1980 while serving in the United States Navy aboard the USS Ponce and USS Coontz and while working as a quarter master at the Brooklyn Navy Yard, Charleston Naval Shipyard, and Norfolk Naval Shipyard.  *See* Exhibit 1 to Crane's Notice of Removal, Docket Sheet 1:13-cv-00273-SAS, Document No. 1.  Crane subsequently removed the case to this Court on January 11, 2013, under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), contending that "[g]iven the proof of significant Navy control over the warnings in conjunction with the Navy's significant knowledge of asbestos hazards, Crane Co. has established a colorable government contractor defense to Plaintiffs' failure-to-warn and design-defect claims."  *Id.*, Notice of Removal, at p. 6.

Notwithstanding these generalized claims, defendant Crane does not in truth have a colorable government contractor defense in this case with regard to plaintiffs' claims.  There is no evidence – and it is simply not the case – that the Navy would have prohibited this contractor,

---

[1] In accordance with this Court's Individual Practice Rules, § IV(B), counsel for plaintiffs hereby certifies that the parties in this matter have exchanged pre-motion letters in an attempt to eliminate the need for this motion to remand.  The effort proved unsuccessful, as defendant Crane Co. stated that it would oppose any attempt by plaintiffs to remand the action to state court

or any of its contractors, from warning about an ultrahazardous component part; rather, all of the relevant specifications establish that the contractors retained full discretion to do so.

The evidence discussed below similarly establishes that, by all indications, Crane could have warned end product users in the Navy about the hazards of the asbestos-containing component associated with its products, and that the Navy not only permitted but required warnings when needed.  Nor is there an iota of evidence indicating that the Navy would have interfered in the slightest with a contractor's issuance of safety warnings.

As the main support for its removal under the federal officer statute, 28 U.S.C. § 1442(a)(1), Crane proffers the affidavit of Admiral David P. Sargent, Jr., for the principal conjecture that, "OEMs[2] [such as Crane Co.] would not have been permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to vary or to deviate in any respect from the Navy specifications in . . . affixing any type of warning or caution statement to equipment . . . beyond those specifically required by the Navy without prior discussion and express approval by the Navy" [Sargent Report, Exhibit 2 to Crane's Notice of Removal, at ¶ 58].  Admiral Sargent's core assertions underlying his report, and hence any government contractor defense Crane or any other defendant may proffer, are problematic both on their face and factually.  On their face, Admiral Sargent's assertions end up saying nothing that is relevant or supportive of a government contractor defense, for even if it is true that a contractor could have warned end users about the ultrahazardous nature of its products upon "prior discussion and express approval by the Navy" [*Id.* at ¶ 58], then this qualification

---

for lack of subject matter jurisdiction.  Accordingly, plaintiffs have proceeded with the instant motion.

means nothing other than that the contractor could have warned, and there is not one iota of evidence, nor is it true, that defendants ever attempted to do so.  Any additional, gratuitous statements on the part of Admiral Sargent to the effect that *if* a contractor had attempted to warn, the Navy would have prohibited such warning [e.g., *id.* at ¶ 63], are pure speculation insufficient to support a government contractor defense.

Indeed, in order to proffer this insupportable conjecture, Admiral Sargent advances a confusing and misleading argument.  Specifically, after speculating that "the Navy would not have permitted . . . asbestos-related warnings" [*Id.* at ¶ 63], he states the basis for this conjecture as follows:

> In this regard, it is useful to consider the Bureau of Ships Technical Manual.  This manual, prepared by the Navy and updated periodically, was intended to provide guidance and information to Navy personnel on various matters. . . .  A review of examples of [various chapters] reveals that . . . the Navy nowhere included any cautionary language regarding – or even any mention of – any potential hazards related to asbestos . . . .  The absence of asbestos-related cautionary language in the Navy's own manuals for equipment or for asbestos-containing materials is consistent with the notion that the Navy did not accept and did not permit, asbestos-related warnings in technical manuals relating to individual pieces of machinery or equipment, and is fully consistent with my experience that such warnings were not neither sought [*sic*] nor welcome from manufacturers of such items.

[*Id.* at ¶¶ 64-66].

Of course, nearly all facts about the world (for example, the fact that ground squirrels hibernate for six months), are "consistent with" any assertion one might venture about whether the Navy would have permitted warnings.  The point is that the lack of any statement whatsoever about warnings in the Bureau of Ships Technical Manual simply does not support the argument

---

² "Original Equipment Manufacturers."

3

Admiral Sargent tries to spin out of that fact, that somehow the Navy would not have permitted such warnings. At best, the lack of any information regarding the health hazards of asbestos in the Manual is relevant solely to the third prong of the *Boyle* test, discussed below, by which defendant must establish, among other things, that the Navy had greater knowledge than the contractor about the specific hazards of exposure to asbestos. The Manual, if relevant at all, evidences the Navy's lack of "greater" or even equivalent knowledge, and thereby cuts strongly against the propriety of any government contractor defense.

Indeed, Admiral Sargent's own affidavit acknowledges that the Navy "often created lengthy memoranda detailing word-by-word line edits to the content of technical manuals submitted for approval, *including the wording of instructional material and warnings*" [Crane Exh. 2, at ¶ 60] (emphasis added). This admission – misleading and confusing in the context of his other claims – is flatly inconsistent with Admiral Sargent's position that contractors could not have proffered warnings, and appears to concede that, quite the contrary, contractors did indeed supply product warnings (albeit not when it came to the supplies of asbestos-containing products).

With respect to Admiral Sargent's further claim, also underlying his entire perspective, that "manufacturers of components were not consulted by the Navy with respect to insulation of their equipment" [*Id.* at ¶ 44], the facts refute this misstatement. Annexed in this regard, as **Exhibit "1"**, is the Declaration of Joseph H. Chilcote, dated July 9, 1981, with his exhibits attached. Mr. Chilcote was a project engineer with the Department of the Navy, Bureau of Ships, from 1942 through 1964. He attested that the Navy did not, and could not practicably, develop its own specifications for thermal insulation materials. Rather, the Bureau of Ships

4

"invariably consulted with industry to determine product availability from preexisting commercial sources," and regularly met with industry representatives, from whom the specifications were derived and taken [Exh. 1, at ¶ 3].

As Mr. Chilcote further attested, in procuring insulation or other asbestos-containing products, the Navy relied wholly upon the manufacturers' "specific and comprehensive knowledge," and adapted its needs and specifications "to products and materials already commercially available," as revealed by the manufacturers [Exh. 1, at ¶3]. Accordingly, it was the contractors' discretion, not the Navy's, which pre-determined the asbestos content of any such products supplied to the Navy during the relevant time periods.

Additionally, a general engineer in the military, Henry George Murad, was deposed in *Gray v. General Dynamics Corp.*, m H-75-327 (D. Conn. May 21, 1979) [excerpts annexed as **Exhibit "2"**]. Mr. Murad served in the U.S. Navy from 1965 to 1979, and beginning in 1969 served in the Naval Ship Engineering Center where he was in charge of specifications and standards for asbestos products [Exh. 2, at 38]. Mr. Murad attested that a principal method by which the Navy arrived at its specifications was "to get information from industry and work with them to – and with the existing engineering and testing organizations – to come up with materials" [*id.* at 40].

As these materials, as well as the additional materials discussed below, demonstrate, Crane's claims in support of its removal under the federal officer statute are demonstrably speculative, unreliable, and, accordingly, wholly insufficient to confer federal subject matter jurisdiction.

5

## II. CRANE DOES NOT HAVE A COLORABLE "GOVERNMENT CONTRACTOR DEFENSE"

"[R]emoval statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand." *Lopez v. Wells*, 2008 WL 2662018, at *2 (S.D.N.Y. July 7, 2008). "If the removing party cannot demonstrate federal jurisdiction by 'competent proof,' the removal was in error and the district court must remand the case to the court in which it was filed." *Hill v. Delta Intern. Machinery Corp.*, 386 F. Supp. 2d 427, 429 (S.D.N.Y. 2005) (citing *Kings Choice Neckwear, Inc. v. DHL Airways, Inc.*, 2003 WL 22283814, at *2 (S.D.N.Y. Oct. 2, 2003).

As the precondition to asserting the government contractor defense with regard to plaintiffs' failure-to-warn cause of action, the defendants must show that the Navy's specifications or contract terms made it impossible for a contractor simultaneously to comply with those specifications and to fulfill State law warnings requirements. *See, e.g., In re Joint Eastern & Southern Dist. Asbestos Litig. – Ferraiuolo*, 715 F. Supp. 1167, 1169 (E.D & S.D.N.Y. 1988) ("[o]n the facts of *Boyle* [*v. United Technologies Corp.*, 487 U.S. 500 (1988)], compliance with both federal and state mandates at once was impossible because each dictated a contrary helicopter design. . . . By contrast, in this case, because the federal specifications were silent on the matter of warnings, defendant could have provided adequate warnings to plaintiffs and complied with the federal specifications"). As the Supreme Court explained in the landmark decision *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), the "displacement of ordinary tort liability" represented by the government contractor defense "occur[s] only where . . . a significant conflict exists between an identifiable federal policy or interest and the [operation] of state law . . . ." *Boyle*, 487 U.S. 500, 507. *Boyle* articulated a general three-prong standard for

6

the defense, being whether (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.*, at 512. Here, Crane (as well as any another defendant) fails to make even a *prima facie* showing that the Navy precluded it from issuing warnings, or that it ever tried to warn, either in a government or commercial setting. *See e.g., Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 199-200, 202 (D. Mass. 2008) (concluding that statement that Air Force "would not have approved any warnings" "amount[s] to speculation," noting that defendants "claim that the military specifications, *though not explicitly forbidding warnings about asbestos,* were so precise that the defendants could not simultaneously warn about asbestos and conform to the specifications," and concluding that, on this claim, "there is simply no basis upon which the Court can conclude that a conflict existed between the federal contracts and the defendants' state-law duty to warn") (emphasis added).

When defendants have asserted a right to the government contractor defense as an excuse for their failure to warn, they have typically omitted the pertinent military specifications which actually address the warnings issue. In all events, the full record of specifications has been analyzed by Captain Arnold P. Moore, who has helped design six major classes of naval warships and been instrumental in the modernization of three additional classes. Annexed hereto as **Exhibit "3"** is Captain Moore's curriculum vitae. Attached as **Exhibit "4"** is the Declaration of Captain Arnold P. Moore, originally submitted in support of remand to the New York State court in the case of *Smith v. Anchor Packing Co.*, m 08 Civ. 7219 (GEL), 2008 U.S. Dist. LEXIS 92041 (S.D.N.Y. Nov. 12, 2008). The Declaration and the documents annexed thereto establish,

7

beyond any reasonable doubt, that the Navy afforded the contractors the discretion, and indeed encouraged and "required" them, to warn about hazards [Exh. 4, at ¶ 11].

Captain Moore also explained, *inter alia* – as illustrative of the Navy's expectation that its contractors *would* take the initiative to issue adequate warnings – that Foster Wheeler submitted drawings subsequently approved ("rubber stamped") by the Navy, which drawings "specifically require[] a boiler component to be equipped with a warning plate. Clearly this drawing illustrates that the U.S. Navy did not prohibit manufacturers from providing warning plates when manufacturers deemed them necessary" [Exh. 4, at ¶ 22].

Indeed, this very Court has issued a relevant remand ruling in *Miranda v. Abex Corp.*, 2008 WL 4778886 (S.D.N.Y. Oct. 31, 2008). In *Miranda*, the Court concluded that "[a] review of the evidence submitted by GE shows that it has failed to assert a colorable federal defense [because] GE can assert a federal defense only if the Air Force 'dictated' the content of warnings to it." *Id.* at *3. As in the present case, defendant's assertions "suggest[ed] that the government was silent as to whether or not (GE was) permitted to warn." *Id.* And, in his Order in *Smith, supra,* granting plaintiff's motion to remand the case for lack of federal jurisdiction (albeit principally on other grounds), Judge Gerard E. Lynch noted that "[t]he federal defense asserted [on the basis of allegations precisely like those of Crane's expert Forman] was in any event, for the reasons advanced by plaintiffs, somewhat dubious" [Order attached hereto as **Exhibit "5"**].

Importantly, plaintiffs attach hereto relevant portions of the very military specifications which pertain to the preparation and contents of instructions intended to accompany equipment supplied to the Navy. These flatly belie any claims Crane could make that there was any significant conflict in the state-versus-federal duties of a defendant equipment manufacturer.

8

Thus, annexed as **Exhibit "6"** is a copy, in relevant part, of the Navy's "Interim Military Specification: Book, Instruction, Preparation, Contents and Approval"–MIL-B-15071A(Ships), effective October 20, 1952.  This document is precisely the specification – alluded to, but never proffered, by defendants – regarding written material to be delivered with equipment supplied to the Navy.  The section addressing "General Data" which equipment suppliers should include within the instruction book or manual they supply with their equipment prescribes that this portion of the contractor's manual "shall contain data such as the following:  a "[s]afety notice (where high voltages or special hazards are involved)" [Exh. 6, at § 3.5.1.1(a)].[3]

Further subsections within this 1952 specification advise that equipment manuals "shall contain methods of installation, alignment, precautions, mounting instructions, recommendations regarding shielding, grounding or bonding" [*id.*, at § 3.5.1.3].  Clearly, this provision concerning information to be provided with respect to installation of the equipment leaves it to the contractor to provide complete and correct "precautions" and safety guidance.

The specification similarly requires "simple, brief and effective instructions, including normal routines and precautions to be observed in starting, operating, and shutting-down the equipment" [*id.*, at § 3.5.1.5], "as well as instructions for disassembly and replacement of worn or damaged parts" [*id.*, at § 3.5.1.6].  Another provision prescribes generally that "[i]nstructions shall be included stressing the importance of properly maintaining any safety devices, interlocks, provided to prevent damage to equipment or injury to personnel" [*id.*, at § 3.4.1.8.1(f)].  This

---

[3]The specification annexes a sample "warning" which concerns "voltages over 300 volts," but the specification's prescription, once again, is that data "such as" any such warning shall be included, and no example is provided with regard to "special hazards" other than high voltages, leaving this to the contractor's discretion.

provision of the actual specification addressing "safety devices" is utterly inconsistent with any claim that the Navy would have prohibited asbestos-related safety warnings.  For by this provision of the very sort of specification alluded to, but tellingly omitted from, defendants' proffers, the Navy *invited and required* that contractors inform equipment users of the need to maintain safety measures that could prevent injury to personnel.

Because the specification was largely otherwise silent, the contractor retained discretion to provide the content of any such safety notice, precautions, and instructions, depending upon the nature of, or special hazards associated with, the particular product being supplied.  In all events, the specification evinced a concern that the contractor adequately provide instructions and precautions with regard both to equipment maintenance and personal safety.  More to the point, there is absolutely nothing whatsoever about this document which supports the view that any defendant was prevented or in any way impaired by Navy regulations from issuing warnings regarding the hazards of asbestos, as defendant would have this Court conclude.

To state a tautology, the contractor whose manual or instruction book accompanying its product complied with the above-referenced specification would necessarily have been deemed to have been in substantial compliance with the specification; and the specification would allow for a finding of substantial compliance in the event the contractor chose to comply with state law by warning about the hazards of its product's asbestos-containing components.  Absent evidence – and not merely insupportable speculation – establishing that the Navy would have precluded defendant contractors from warning, or at the least engaged in a "continuous back and forth" the outcome of which was the Navy-endorsed failure to warn, there is no genuine, colorable issue concerning the government contractor defense.

10

Also annexed hereto as **Exhibit "7"** is a copy, in relevant part, of the "Military Specification: Manual, Technical, For Mechanical and Electrical Equipment (Less Electronics)"– MIL-M-15071C(Ships), effective September 10, 1957.  By this time, the specification governing written materials to be disseminated with products evinced even more concern that equipment suppliers provide safety instructions and precautions where, and to the extent, necessary.

For instance, the 1957 section on "operating instructions" prescribed, in part, that "[i]nformation shall include routine and emergency procedures, and safety precautions" [Exh. 7, at § 3.3.1.2.5].  The section on "installation," expanding on earlier versions of the specification noted above, requires that the contractor provide information concerning "methods of installation, including packing or unpacking, handling, preparation of foundation, alignment, precautions, mounting instructions, bolting diagrams, recommendations regarding shielding, safety guards, grounding or bonding" [*id.*, at § 3.3.1.2.6].

Contrary to the impression defendant seeks to convey, no limitation or restriction is placed on the sort of precautions that should accompany the product pertaining to any hazard that might arise during the installation process.  As prescribed in previous versions, the 1957 specification required that there be "[i]nstructions stressing the importance of properly maintaining any safety devices or interlocks provided to prevent damage to equipment or injury to personnel" [*id.*, at § 3.3.1.2.7.1(e)].

All of that being said, the 1957 specification went significantly beyond its predecessors in certain critically relevant respects.  The paragraph governing the "Scope" of the specification states: "This specification covers *the minimum requirements* for preparing and revising technical manuals for electrical and mechanical equipment(s)" [Exh. 7, at § 1.1 (emphasis added)].  By

11

this language, the 1957 specification clearly affords the contractor leeway and discretion to provide greater protection and more detailed health and safety precautions to equipment users than might otherwise be suggested in the specification.

Toward this end, Section 3.3.3.2, labeled "Emphasis," prescribes in general terms that:

When necessary, emphatics such as "NOTE", "CAUTION", and

"WARNING" shall be used as adjuncts to the text. These, however, shall be used as sparingly as is consistent with the real need. The appropriate adjunct to the text shall be selected in accordance with the following definition:

(a) "NOTE" – An operating procedure, condition, etc., which it is essential to highlight.

(b) "CAUTION" – Operating procedures, practices, etc., when if not strictly observed, will result in damage or destruction of equipment.

(c) *"WARNING" – Operating procedures, practices, etc., which will result in personal injury or loss of life if not correctly followed.*

[Exh. 7, at § 3.3.3.2 (emphasis added)].

Clearly, by virtue of Section 3.3.3.2, the specification left it up to the contractor to rely upon its expertise and knowledge of the hazards of its products, to determine what the "real need" was with regard to any particular equipment, and, whenever appropriate and necessary, to direct a "WARNING" to product users, advising them to employ safe operating procedures and practices to be set forth by the contractor to prevent personal injury or loss of life.

Additionally fatal to Crane's position, and to any government contractor defense to plaintiffs' failure-to-warn claims, is the Navy's October 1969 Consolidated Hazardous Item List ("CHIL") publication, annexed hereto in relevant part as **Exhibit "8."** As the Navy states therein, Navy-specified labels "*supplement* labels/markings . . . applied by the MCA

12

(Manufacturers Chemist Association), NFPA (National Fire Protective Association), and/or manufacturer. These supplemental labels *shall not* cover, or cause to deface or remove any other hazardous labels/markings affixed to the containers in accordance with the preceding regulations" [Exh. 8, at viii] (emphasis in original). Again, this document establishes that the Navy invited and expected the product seller's participation in supplying warnings pursuant to state warnings requirements, in direct contradiction to Admiral Sargent's assertions.

Moreover, in his own very recent deposition testimony in *In re New York City Asbestos Litig.: April 2012 In-Extremis Lung Cancer Group v. Crane Co.* (Sup. Ct., NY County, Sept. 17, 2012) [annexed in relevant part as **Exhibit "9"**], Dr. Samuel A. Forman, whose Report and Declaration Crane submitted in support of its Notice of Removal, flatly admitted, at the very least, "that if a warning on an asbestos product or on a container, any sort of warning about the hazards of asbestos was consistent with the Navy's understanding of the hazard and how it wished to control the hazard, then it would allow the warning" [Exh. 9, at 57-58]. But at the same time Dr. Forman also admitted that he could not cite to a single example "where, in fact, a company proposed a warning for asbestos that [he] believed was inconsistent with the Navy's understanding of the hazard or how to control it, and the Navy's actions precluded" the warning, and explained that any such opinion that the Navy would do so are merely "hypothetical" and thereby speculative on his part [*id.*, at 59-60].

In sum, as Captain Moore attests, the Navy did not dictate warnings and safety requirements, did not prevent manufacturers from warning, but rather "relied heavily upon its manufacturers and vendors to identify hazards associated with their products," and "to provide warnings" about those hazards [Exh. 4, at ¶¶ 11-12]. It is thus clear that Crane, and for that

13

matter every defendant in this case, certainly could have complied both with its contractual requirements and with state law warnings requirements.  As stated in *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653 (E.D. Tex. 1999), involving defendant GE and others, "the federal government provided no direction or control on warnings when using asbestos; moreover, the federal government did not prevent Defendants from taking their own safety precautions heeding state-law standards . . . ."  48 F. Supp. 2d at 663.

As further stated by the Federal court in *Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129 (D. Mass. 2009), wherein defendants proffered the affidavits of Admiral Sargent, Dr. Forman, and others, defendants:

> together submitted volumes of evidence seeking to show that the Navy would not have permitted them to warn about the dangers of asbestos, if they had tried.  But the Court's decision rests ultimately on what is missing from the record.  The defendants have submitted no evidence that the Navy expressly prohibited asbestos warnings by manufacturers; no evidence that they ever attempted to warn about asbestos destined for the Navy; no evidence that the Navy ever rejected any other manufacturer's proposed asbestos warning; and no evidence that defendants warned of asbestos on other, non-military equipment they produced during the same period, by contrast to the equipment they supplied to the Navy.  Finally, they offer no persuasive evidence of an overall Navy-wide policy that would have conflicted with manufacturer asbestos warnings.

*Id.* at 137.

Crane's grounds for removal must also certainly fail with respect to the third prong of the *Boyle* test, by which defendant must establish that the Navy had greater knowledge than the contractor about the specific hazards of exposure to asbestos.  Defendants' expert in various cases, Lawrence Stilwell Betts, a retired United States Navy Captain, has admitted that, during the time periods when the most significant asbestos exposures occurred, the Navy was unaware of the special hazard posed by asbestos [Betts Affidavit annexed hereto as **Exhibit "10"**, at ¶ 7].

14

Admiral Sargent has testified that he personally was unaware of the dangers of asbestos exposure until the mid- to late 1970s [Sargent deposition transcript pages annexed as **Exhibit "11"**, at pp. 96-97]. Dr. Forman testified the Navy relied on the erroneous Fleischer-Drinker Report, issued in 1946, which indicated that asbestos thermal insulation posed no threat to shipyard workers [Forman deposition transcript pages annexed as **Exhibit "12"**, at pp. 41-42].

Moreover, James Delaney, a retired Navy Commander and machinist, has testified that the Navy never provided training regarding asbestos, despite the fact that the Navy provided training about other health hazards in the workplace – suggesting both that (1) if the Navy knew about asbestos-related health hazards, the Navy was not responsible for warning about them and left this task to the contractors and manufacturers, and/or (2) the Navy did not know about asbestos-related health hazards [Delaney deposition transcript pages annexed as **Exhibit "13"**, at pp. 75-78].

In this vein, as well, annexed hereto as **Exhibit "14"** is an excerpt from the deposition testimony, in *Van Buskirk v. United States of America*, m 798-548 (E.D. Pa. Aug. 29, 1979), of Alvin Vincent Anceravage, then Head of the Packaging and Container Section of the Naval Sea Systems Command Materials and Engineering Division [Exh. 14, at 7], and thereby directly involved in the "packaging and labeling" of products supplied by government contractors [Exh. 14, at 50]. Mr. Anceravage attested that, "When we get a request requesting packaging requirements we find out who are the possible suppliers. We call the suppliers up and we ask them, first, what is their normal retail, commercial, or wholesale procedures on packaging of this item . . . and then we develop those requirements based on what industry normally uses to furnish the general public" [*id.*, at 50]." Again, this testimony, like numerous other of the instant

15

exhibits, refutes the claim that the Navy did not invite, welcome, or permit contractor involvement, input and decision-making with respect to the warnings issue.

Even more to the point, the Anceravage deposition included the following colloquy:

Q.  Are there any packaging requirements that state what can or cannot be on the package?

A.  Would you clarify that question?

Q.  Are there any regulations that state what can be on a package that is sent to the government?

A.  As to marking and labeling?

Q.  Right.

A.  The minimum requirements are established by MIL Standards 129.

Q.  Okay, do these standards indicate the only things that can be on a package?

A.  No. . . .  The contractor can put anything on a package.

Q.  Oh, he can?

A.  Definitely; they are minimum. . . .  I have never seen any objection to a manufacturer using his commercial package so long as his commercial package met the requirement of the packaging requirements of that commodity . . . .

Q. Do these requirements ever prohibit anything from being on a package?

A. Not that I know of.

[Exh. 14, at 118-19].

Finally, as previously noted, it is well to consider the recent deposition testimony of Admiral Sargent himself in *In re New York City Asbestos Litig.:  April 2012 In-Extremis Lung Cancer Group v. Crane Co.* (Sup. Ct., NY County, Sept. 18, 2012) litigation [annexed in relevant part as **Exhibit "15"**].  At that deposition, Admiral Sargent admitted that he was

16

"unaware of any Navy specification, from the 1920s through the early- to mid-1970s, that required a specific warning regarding asbestos" [Exh. 15, at 39].  Nor was he aware of any "Navy order or direction or memo or suggestion" during that period that required any sort of specific asbestos-related warning [*id.*, at 39-40].  And he was not aware, "from the 1920s to the early- to mid-1970s, . . . of any Navy specifications, orders, directions or new document that specifically prohibited a warning regarding asbestos" [*id.*, at 40-41].

III.   **CONCLUSION**

Accordingly, for the reasons discussed herein, and in light of Crane's failure to demonstrate any colorable basis for federal subject matter jurisdiction, plaintiffs respectfully request that their motion to remand this action back to the Supreme Court of New York, County of New York, where it originated, be granted in its entirety.

Dated: August 8, 2013

Respectfully submitted,

*Kyle A. Shamberg*
_____
Kyle A. Shamberg, Esq. [KS-5015]
**WEITZ & LUXENBERG, P.C.**
Attorneys for Plaintiffs
700 Broadway
New York, New York 10003
(212) 558-5500
kshamberg@weitzlux.com

CC: All Defense Counsel via CM/ECF